UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JASON ROSS,                                )
                                           )
                    *Plaintiff*,           )
                                           )
              v.                           )        No. 1:20-cv-00642-JMS-MJD
                                           )
FEDEX FREIGHT,                             )
                                           )
                    *Defendant*.           )

## ORDER

Plaintiff Jason Ross, who has Bell's palsy and other health issues, was employed at Defendant FedEx Freight ("FedEx") as a driver.  In 2014, Mr. Ross was prescribed hydrocodone-acetaminophen to alleviate pain following a dental procedure.  On April 1, 2019, Mr. Ross was selected for drug testing and the test confirmed the presence of opioids.  Mr. Ross claimed that he had taken hydrocodone-acetaminophen pursuant to the prescription he received in 2014, but FedEx ultimately terminated Mr. Ross's employment based on the positive drug test and Mr. Ross's failure to provide proper documentation for the prescription.  Mr. Ross initiated this action on February 26, 2020, asserting claims against FedEx for: (1) discrimination under the Americans With Disabilities Act, 42 U.S.C. § 12181, *et seq.* ("ADA"); (2) retaliation under the ADA; (3) failure to accommodate under the ADA; (4) confidentiality violations under the ADA; (5) intentional infliction of emotional distress; and (6) violations of the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* ("FMLA").  [Filing No. 1 at 7-11.]  FedEx has moved for summary judgment on all of Mr. Ross's claims, [Filing No. 43], and its motion is now ripe for the Court's consideration.

1

# I.

## STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e). And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.* The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion. Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.
### STATEMENT OF FACTS

At the outset, the Court notes that neither party has complied with the Court's Practices and Procedures.  [Filing No. 4.]  Specifically, The Court's Practices and Procedures provide that "[i]n a supporting brief, [a party must] cite to the docket number, the attachment number (if any), and the applicable .pdf page as it appears on the docket information located at the top of the filed document," and provides an example of the proper citation form.  [Filing No. 6 at 4.]  Neither party has used the proper citation form in their briefs.  FedEx cites generally to lengthy exhibits, without providing the docket number of the exhibit or the page number upon which the referenced information appears.  For example, in its Statement of Material Facts Not in Dispute, FedEx states that "[Mr.] Ross operated a CMV in interstate commerce traveling to numerous states," and cites to "Exhibit A."  This citation is unhelpful as it does not provide the Court with the docket number where Exhibit A appears – it is Filing No. 43-1 – nor does it provide the Court with the page number within the 13-page document where the referenced information can be located.  Mr. Ross's citation form is slightly better, as he provides the relevant page or paragraph number of the document to which he cites, but not the docket number of the referenced exhibit nor the applicable .pdf page as it appears on the PACER docket information located at the top of the filed exhibit.

3

The parties' failure to follow the Court's citation rules as clearly set forth in its Practices and Procedures, [*see* Filing No. 4 at 15-17 (Appendix A – "Procedure for Filing Exhibits and Proper Citation Form When Filing a Motion or Brief…")], has made the Court's review of the pending motion unnecessarily cumbersome.  Moreover, as the Practices and Procedures warn, the parties' failure to comply with the Court's filing and citation procedures could have "result[ed] in [the motion] being stricken or arguments being waived." [Filing No. 4 at 17.]  The Court has done its best to locate the information relied upon by both parties in the record, but cautions them that full compliance with the Court's Practices and Procedures is required and expected in this and other litigation going forward.

That said, the following factual background is set forth pursuant to the standard detailed above.  The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

**A.      Mr. Ross's Employment at FedEx**

Mr. Ross was employed at FedEx as a Road Driver operating a Commercial Motor Vehicle ("CMV"), and was subject to Department of Transportation ("DOT") regulations.  [Filing No. 58-1 at 1.]  Mr. Ross traveled to many different states as a FedEx CMV driver.  [Filing No. 43-1 at 5.]

**B.      FedEx's Drug Policy**

FedEx's Drug and Alcohol Policy provides as follows:

**OVERVIEW**

[FedEx] is committed to an alcohol and drug-free workplace.  [FedEx] complies with the [DOT] and Federal Motor Carrier Safety Administration (FMCSA)

regulations for drug and alcohol testing, as well as other applicable federal and state laws.

\*　　　　　\*　　　　　\*

**POLICY**

As a condition of employment, an employee or applicant is required to accept and abide by this policy. [FedEx] reserves the right to test employees for drug and alcohol violations at any time. Testing will comply with applicable federal laws, regulations, and applicable state statutes and regulations.

[FedEx] strictly prohibits all of the following:

- The use or consumption of illegal drugs while on or off duty….

- The abuse or misuse of legal (prescription or over the counter) drugs while on or off duty.
  **Note:** Any employee who is taking a drug identified as having the potential to adversely affect the employee's ability to safely perform certain job functions must notify leadership before performing such job functions.

- The unlawful manufacture, distribution, dispensation, possession, or use of illegal drugs.

- The use, possession of, or being under the influence of alcohol or illegal drugs while on-duty, including during meal periods and breaks, or while on company property….

- The use, possession of, or being under the influence of alcohol or illegal drugs while operating any company vehicle, including a company car, company truck, or company van.

\*　　　　　\*　　　　　\*

[A]ll employees are subject to reasonable suspicion testing. DOT regulated employees are also subject to random and post-accident testing….

After being instructed to take a drug test, an employee who admits to the use or consumption of illegal drugs and/or abuse of legal (prescription or over the counter) drugs must be immediately removed from performance of any ***safety-sensitive functions\****. After such an admission, [FedEx] does not require the employee to complete the test; however, Safety must be notified immediately.

***Safety-sensitive functions*** include:

**(1)** All time waiting to be dispatched, unless the "***driver***" has been relieved from duty by [FedEx];

**(2)** All time inspecting, servicing, or conditioning a "***commercial motor vehicle***" for [FedEx];

**(3)** All time spent at the driving controls of a "***commercial motor vehicle***" in operation;

**(4)** All time, other than driving time, in or upon any "***commercial motor vehicle***" except time spent resting in a sleeper berth;

**(5)** All time loading or unloading a vehicle, supervising, or assisting in the loading or unloading, attending a vehicle being loaded or unloaded, remaining in readiness to "***operate***" the vehicle, or in giving or receiving receipts for shipments loaded or unloaded; and

**(6)** All time repairing, obtaining assistance, or remaining in attendance upon a disabled vehicle.

The company will maintain strict confidentiality for employees involved in the drug/alcohol testing program.

*          *          *

**TESTING – DOT**

In addition to company policy, DOT regulated employees are subject to the drug and alcohol testing requirements as established by the DOT and as outlined below:

- Pre-employment

- Random

- Post-Accident

- Reasonable Suspicion

- Return-to-Duty

- Follow-up

*          *          *

6

**Prohibited Conduct for DOT-Regulated Employees**

While still complying with all FMCSA regulations and all applicable laws, [FedEx] may utilize, at its discretion, any recognized investigative technique for the detection of illegal or prohibited drug/alcohol use or abuse.  As a condition of continued employment, all employees must cooperate in any investigations.

The conduct described below represents prohibited/disqualifying acts set forth by [FedEx] though not necessarily prohibited by FMSCA regulations.  The following are examples of conduct that immediately disqualify a driver:

1.      Violation of any federal or state motor carrier regulation involving the use or possession of alcohol or drugs.

2.      Illegal use or possession of one or more of the following substances: marijuana, cocaine, opioids, amphetamines, phencyclidine (PCP).  Illegal use is determined by a verified positive drug test.

3.      Engaging in prohibited conduct as described in the section *What Conduct is Prohibited* in the [FedEx] "***Drug and Alcohol Policy: Program Guidelines***."

                    *                    *                    *

**DOT   RANDOM   DRUG   AND   ALCOHOL   TESTING   AND COMPENSATION**

All DOT regulated employees are subject to random drug and alcohol testing.  Random tests will be conducted in accordance with DOT regulations….

1.      Employees cannot be forewarned of the test, as the test must be administered immediately (normally within 2 hours).

**Example:** Employee cannot be told today that he/she will be tested tomorrow.

**Example:** Employee cannot be told this morning that he/she will be tested this afternoon.

2.      Any attempt on the employee's part to delay or postpone the test will be considered a refusal to be tested.

[Filing No. 43-11 at 1-5 (emphasis in original).]

## C.     Mr. Ross's Health Issues and Medications

In 2012, Mr. Ross was diagnosed with Bell's palsy, related functional disability in his jaw, severe ongoing pain, and hearing issues.  [Filing No. 58-1 at 1.]  Mr. Ross was prescribed steroids to address the Bell's palsy and medication to treat migraines caused by Bell's palsy.  [Filing No. 58-2 at 44-48.]

In 2014, Mr. Bell had several teeth extracted by Dr. Li Chee, and was prescribed hydrocodone-acetaminophen to manage his pain as needed.  [Filing No. 58-1 at 1.]  Following the dental procedure, Mr. Ross informed his manager at FedEx, Jeff Curp, that he had been prescribed hydrocodone-acetaminophen for pain management, and also that he had been prescribed medication for migraine headaches.  [Filing No. 58-1 at 2.]  Mr. Curp recorded the prescription numbers and the names of the medications, and told Mr. Ross that he could have a day off on days when he needed to take the pain medication.  [Filing No. 58-1 at 2.]

Mr. Ross's hydrocodone-acetaminophen prescription contained twenty pills, and he took several of the pills following the teeth extraction but did not take all twenty and kept the remaining pills to manage pain if needed and as instructed by Dr. Chee.  [Filing No. 58-1 at 1.]  Mr. Ross re-filled the pain medication prescription on January 4, 2015.  [Filing No. 61-1 at 2.][1]  When his doctors prescribed the same medication on occasions between 2014 and 2019, Mr. Ross informed

---

[1] Mr. Ross states in his Declaration that he "never fulfilled any additional prescriptions for hydrocodone-[a]cetaminophen, even though [he] was prescribed the same medicine for pain on several occasions between 2014 and 2019 following additional dental procedures and teeth extractions."  [Filing No. 58-1 at 1.]  But records from his pharmacy indicate that he filled a prescription for hydrocodone-acetaminophen on January 4, 2015.  [Filing No. 61-1 at 2.]  While the Court is required to construe all disputed facts in favor of Mr. Ross as the non-movant, it is not required to consider facts set forth by Mr. Ross in his Affidavit which are plainly contradicted by uncontroverted documentary evidence.  *See Walkers v. Peters*, 863 F. Supp. 671, 672 (N.D. Ill. 1994) (Court is not required to "credit testimony that, because it has been irrefutably contradicted by documentary evidence, is inherently incredible").

them that he would just take the remaining pain medication from his original 2014 prescription if needed.  [Filing No. 58-1 at 1-2.]

### D.      Mr. Ross's DOT-Mandated Examinations and Qualifications

As a CMV driver, DOT regulations required that Mr. Ross undergo Commercial Driver Fitness Evaluations and complete Medical Examination Report Forms (the "DOT Forms") on a regular basis.  [Filing No. 43-2; Filing No. 58-1 at 2.]  The DOT Form requires that the driver and the examining physician discuss any medications that could present a hazard while driving, including prescriptions and over-the-counter medications, and the driver is required to disclose on the DOT Form whether he or she is taking any such medications.  [Filing No. 43-2.]  Mr. Ross did not disclose the use of any prescription medications on his DOT Forms from 2016 to 2018.  [Filing No. 43-4.]  Mr. Ross's last Commercial Driver Fitness Evaluation was on January 18, 2019, and he did not disclose the use of any prescription medications on his DOT Form.  [Filing No. 43-3.]

### E.      Random Drug Testing for FedEx CMV Drivers

The Federal Motor Carrier Safety Administration requires FedEx to maintain a random drug testing program.  [Filing No. 43-6 at 1.]  FedEx contracts with a third-party vendor, DSI Medical ("DSI"), to manage its random drug testing program.  [Filing No. 43-6 at 1.]  FedEx provides a list of all qualified drivers to DSI each month, and DSI randomly selects approximately 1,000 drivers to be tested that month.  [Filing No. 43-6 at 1.]  Federal regulations require FedEx to randomly test 50% of driver-qualified employees each year.  [Filing No. 43-6 at 1.]  DSI notifies FedEx by email regarding which employees were randomly selected for a drug test.  [Filing No. 43-6 at 2.]  No one at the FedEx Service Centers knows who will be selected for a random drug test, and FedEx cannot and does not add employees to the list of those to be randomly tested.  [Filing No. 43-6 at 2.]  Once FedEx receives the list of individuals to be randomly tested from

DSI, an email is sent out to the managers notifying them who has been selected for testing that month. [Filing No. 43-6 at 2.] It is the manager's responsibility to send employees who have been selected to the clinic for testing. [Filing No. 43-6 at 2.] Because of the random nature of the drug testing, some drivers may be selected multiple times a year for testing and others may go years without being tested. [Filing No. 43-6 at 2.]

### F. Mr. Ross's Use of His 2014 Prescription in 2015 and 2018

Mr. Ross informed his FedEx managers of his occasional use of prescription pain medication on at least three occasions. [Filing No. 58-1 at 2.] On May 23, 2015, Mr. Ross told his manager at the time, Adam Mason, that he needed to take a prescription pain pill but, because it was a Saturday, he did not need to take a day off. [Filing No. 58-1 at 2.] Mr. Mason asked Mr. Ross for the prescription, and Mr. Ross took a photo of the prescription bottle and texted it to Mr. Mason. [Filing No. 58-1 at 3.] The photo was of "[Mr. Ross's] prescription bottle containing [his] prescribed pain medication and was the same pain medication [he] was prescribed by Dr. Chee in 2014." [Filing No. 58-1 at 3; Filing No. 58-1 at 7-8.] Mr. Ross also reported his occasional use of the pain medication prescribed in 2014 to his then-FedEx manager, Terrell Toles, on September 4, 2018. [Filing No. 58-1 at 3.] Mr. Ross attached a photo of the prescription bottle to a text message to Mr. Toles, and the photo that he took on September 4, 2018 was of "[his] prescription bottle containing [his] prescribed pain medication and was the same pain medication [he] was prescribed by Dr. Chee in 2014." [Filing No. 58-1 at 3; Filing No. 58-1 at 9-10.]

### G. Mr. Ross's FMLA Leave Requests

Mr. Ross requested FMLA leave several times while a FedEx employee. [Filing No. 43-12 at 1.] Specifically, he applied for and received intermittent FMLA leave within the periods of June 26, 2014 to June 24, 2015; April 7, 2016 to April 7, 2017; and July 27, 2017 to July 28, 2018.

[Filing No. 43-12 at 1.]  The FMLA leave was for treatment visits for migraines, sleep apnea, and Bell's palsy.  [Filing No. 43-12 at 1-2; Filing No. 61-2]  None of the documentation that Mr. Ross submitted for the intermittent FMLA leave during those time periods mentioned needing surgery or needing treatment for dental issues or hearing loss.  [Filing No. 43-12 at 2; Filing No. 61-2.]

On August 13, 2018, Mr. Ross's physician, Dr. Brendan Sweeny, submitted FMLA paperwork to FedEx to renew Mr. Ross's existing FMLA leave for treatment of migraine headaches, sleep apnea, and Bell's palsy.  [Filing No. 58-1 at 2; Filing No. 58-5.]  The paperwork submitted on August 13, 2018 did not reference needing treatment for dental issues or hearing loss, nor did it reference needing surgery.  [Filing No. 58-5.]  During the following months, Mr. Ross complained to Human Resources and various FedEx managers that his FMLA request was not being processed.  [Filing No. 58-1 at 2.]  When he explained the situation to FedEx manager Curt Graft, Mr. Graft contacted Tamara McElroy, a FedEx Human Resources representative, who then told Mr. Ross that some required documentation was missing.  [Filing No. 58-1 at 2.]  Dr. Sweeny completed the missing documentation and again faxed the FMLA request to FedEx on March 18, 2019.  [Filing No. 58-1 at 2.]

That same day, Debra Rhoades, a Specialist – Leave of Absence at FedEx, received the completed FMLA leave request from Dr. Sweeny.  [Filing No. 43-12.]  The documentation did not mention any need for surgery, nor did it mention needing treatment for dental issues or hearing loss.  [Filing No. 43-12 at 2; Filing No. 61-2 at 18-28.]  Ms. Rhoades requested additional information from Mr. Ross, including the dates for which Mr. Ross was requesting leave and the type of leave he was requesting.  [Filing No. 43-12 at 2.]  Ms. Rhoades did not receive the additional information that she had requested before Mr. Ross was eventually terminated.  [Filing

No. 43-12 at 2.]  FedEx did not deny any of Mr. Ross's FMLA leave requests.  [Filing No. 43-12 at 2.]

Neither Mr. Ross's Bell's palsy nor his teeth issues required any specific accommodation at his job with FedEx, and Mr. Ross did not request any accommodations for those conditions. [Filing No. 43-1 at 10-11.]

### H.    Mr. Ross's 2019 Use of the 2014 Prescription and His Drug Test

Mr. Ross took the pain medication prescribed in 2014 for the last time on Saturday, March 30, 2019.  [Filing No. 58-1 at 3.]  When he woke up that morning, his filling from his 2014 dental work had fallen out and he was in pain.  [Filing No. 58-1 at 3.]  He took his last prescribed pain pill around 6:30 a.m. and slept much of the day.  [Filing No. 58-1 at 3.]  The following morning, he contacted Mr. Toles by text message and asked for a day of leave under the FMLA so that he could visit his dentist to address the lost filling and resulting pain.  [Filing No. 58-1 at 3.]  When he did not receive a response, Mr. Ross called Mr. Toles and explained that he needed a day off to address his medical issues and informed him that he had taken his last pain pill and needed to visit his doctor.  [Filing No. 58-1 at 3.]  Mr. Toles denied Mr. Ross's request for a day off.  [Filing No. 58-1 at 3.]  Mr. Ross did not have any remaining personal time, because FedEx had not approved his FMLA leave request.  [Filing No. 58-1 at 3.]  Mr. Ross then sent Mr. Toles a text message with a picture of the prescription bottle.  [Filing No. 58-1 at 3.]  The prescription bottle in the picture was different than the prescription bottle he sent a picture of in May 2015.  [Compare Filing No. 58-1 at 7 (directions on bottle state "Take 1 Tablet by mouth…") and Filing No. 58-1 at 11 (directions on bottle state "Take one to two…").][2]  Because Mr. Ross could not take a day off

---

[2] The Court is unable to read the label on the bottle in the pictures Mr. Ross sent in 2018, [*see* Filing No. 58-1 at 9-10], so cannot determine whether that bottle was the same as the bottle depicted in the 2015 picture, the 2019 picture, or neither picture.

without facing discipline, he reported to work and completed his trip to West Virginia and back to Indiana. [Filing No. 58-1 at 3.] His pain was so bad that he was crying. [Filing No. 58-1 at 3.]

While Mr. Ross was driving on April 1, 2019 to complete his trip, the FedEx dispatcher called him several times to ask where he was and instructed him to report to dispatch when he returned to Indiana. [Filing No. 58-1 at 3.] Mr. Ross did so, and was informed that he needed to take a drug test. [Filing No. 58-1 at 4.] This was the first and only time that Mr. Ross was selected for a drug test in all of his years working at FedEx. [Filing No. 58-1 at 4.] DSI performed the drug test, and Mr. Ross advised the woman at the testing site that he was in a lot of pain and had taken a pain pill on March 30, 2019. [Fling No. 43-6 at 2; Filing No. 58-1 at 4.] The woman advised Mr. Ross that if the pain medication was detected, it would not be a problem and he would just need to provide the prescription to the Medical Review Officer. [Filing No. 58-1 at 4.] The result – positive for "Opioids – Hydromorphone" – was certified by Dr. Phillip Lopez of DSI. [Filing No. 43-6 at 2.] Dr. Lopez then contacted Mr. Ross and informed him of the positive result, Mr. Ross advised Dr. Lopez that he had taken a pain pill on March 30, and Dr. Lopez requested the prescription. [Filing No. 58-1 at 4.] Additionally, Brittany Starkey, a Specialist with Safety-Compliance at FedEx, sent out an email advising that Mr. Ross was disqualified from driving any FedEx Freight CMVs and was not permitted to work in any safety-sensitive function due to the positive drug test result. [Filing No. 43-6 at 2.]

On April 9, 2019, Mr. Ross faxed the 2014 prescription that he had received from Dr. Chee to Dr. Lopez. [Filing No. 58-1 at 4.] Mr. Ross received a voicemail the next day, on April 10, from the FedEx Center Manager, stating "[w]e have a determination…on the positive DOT random drug test and determination is a termination." [Filing No. 58-1 at 4; Filing No. 58-1 at 13.]

On April 12, 2019, Dr. Lopez changed the result of Mr. Ross's random drug test to "negative" because Mr. Ross had produced the 2014 prescription. [Filing No. 43-6 at 2.] However, Dr. Lopez also advised Mr. Ross that he needed to produce a Safety Concern Letter from the prescribing physician. [Filing No. 43-6 at 2.] Also on April 12, Ms. Starkey sent a letter to Mr. Ross stating:

> Our Medical Review Officer has requested we secure a safety concern letter from your prescribing physician due to medication(s) that the DOT random drug test revealed.
>
> Please be advised that you have shared information regarding potential safety sensitive issues concerning l[e]gitimate medical use of prescribing prescription medication.
>
> In accordance with DOT policy, we are informing you of safety concerns that should entail a review and confirmation by the prescribing physician to determine whether there is a risk of your operating in a safety sensitive function and performing the essential job duties of the position you hold, which include operating as a commercial motor vehicle operator (CMV). ***It is incumbent upon your <u>prescribing</u> physician to be fully aware of the safety sensitive requirements of your position and the nature of the work, responsibilities, and equipment/machinery you operate***.
>
> Accordingly, you must have your prescribing physician provide in writing on his/her letterhead that the prescribing mediation:
>
> - Is prescribed for you;
> - Prescribed with the physician's full knowledge of the safety sensitive duties of the work, responsibilities, and equipment/machinery you operate;
> - Prescribed in dosage amounts and in a regimen consistent with safe performance of your job responsibilities; and
> - Confirm that the prescription and dosage would not pose a safety risk and that <u>some method of monitoring will occur during the duration of this treatment</u>.
>
> This letter will confirm the verbal notification and will detail your responsibilities in securing the necessary documentation to allow you to continue to work in a safety sensitive function.

[Filing No. 43-10 at 1 (emphasis in original).]

14

On April 12, 2019, Mr. Ross contacted Dr. Sweeny's office, and an entry in his medical records for that day states:

> [Mr. Ross] states he had a tooth ache and decided to take some old norco prescribed by Dr. Sweeny about 3-4 years ago.
>
> [Mr. Ross's] employer happened to request a random drug screen and the norco showed up. He was fired and is now fighting the termination because he said it was prescribed by his physician.
>
> He is asking for documentation…regarding this.

[Filing No. 43-8 at 4.]

> Mr. Ross's medical records from Dr. Sweeny's office for April 15, 2019 state:
>
> Received a letter from Brittany Starkey from FedEx Fr[e]ight Safety asking for a letter regarding safety concerns regarding opiates. I called and spoke with Brittany and asked her what exactly she is looking for. She stated that patient had a DOT physical and it showed opiates (percocet or hydrocodone) and patient said that Dr. Sweeny prescribed it for him. I let her know that the last time it was prescribed was in 2014, and that Dr. Sweeny will not write a letter for a narcotic that was given 4 years ago. She agreed.
>
> Pt called back and I informed him that [B]randi called to see what medication they were needing the letter for. The lady from his work told us it was for hydrocodone and I explained to him that we can not write a letter for that since it was last prescribed in 2014. He said that he told them it was from 3 years ago. I again explained that we could no[t] write a letter on a script that old. Patient voice understanding.

[Filing No. 43-8 at 3.]

Neither Ms. Starkey nor anyone at FedEx ever received a Safety Concern Letter from Dr. Chee, the prescribing physician for the 2014 medication. [Filing No. 43-6 at 3.] Mr. Ross attempted to get a Safety Concern Letter from Dr. Chee, but he had retired and Mr. Ross was unable to find another doctor to provide the letter. [Filing No. 43-1 at 12-13.] Mr. Ross asked FedEx if he could visit Dr. Lopez for an evaluation and safety letter, but FedEx did not allow him to do so. [Filing No. 58-1 at 4.] Mr. Ross, however, was informed by "a representative from

FedEx HQ" that he would receive a letter for his signature that would allow him to return to his job.  [Filing No. 58-1 at 4.]  When Mr. Ross called FedEx Human Resources in Indianapolis to check on the letter, he was told by Ms. McElroy "Stop bothering my supervisors.  You will never get your f***ing job back."  [Filing No. 58-1 at 4.]

## I.    The Lawsuit

Mr. Ross initiated this action on February 26, 2020, and alleges claims for: (1) discrimination under the ADA; (2) retaliation under the ADA; (3) failure to accommodate under the ADA; (4) confidentiality violations under the ADA; (5) intentional infliction of emotional distress; and (6) violation of the FMLA.  [Filing No. 1 at 7-11.]  FedEx has moved for summary judgment on all of Mr. Ross's claims.  [Filing No. 43.]

## III.
### DISCUSSION

### A.    ADA Discrimination Claims

The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  "The ADA then defines 'discriminate against a qualified individual on the basis of disability' to include disparate treatment and failure to accommodate: 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee.'"  *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019) (emphasis omitted) (quoting 42 U.S.C. § 12112(b)(5)(A)).  Mr. Ross asserts both disparate treatment and failure to accommodate claims under the ADA, and the Court addresses each claim in turn.

### 1. *Disparate Treatment*

In support of its Motion for Summary Judgment, FedEx argues that even if Mr. Ross is considered disabled, he cannot set forth a prima facie case of ADA discrimination because he was not qualified and did not meet FedEx's legitimate employment expectations since he was not able to legally operate a CMV with a positive drug test. [Filing No. 42 at 9-10.]  It asserts that "[n]othing in the ADA purports to change [FedEx's] obligation to comply with DOT requirements," and also contends that Mr. Ross was not meeting FedEx's legitimate expectations because he violated FedEx's policy on the use of drugs. [Filing No. 42 at 11.] FedEx argues that it had a legitimate, non-discriminatory reason for drug testing Mr. Ross and terminating him – namely, that DOT regulations required drug tests and that FedEx policy required his termination once he tested positive and failed to provide a Safety Concern Letter. [Filing No. 42 at 12-13.] FedEx also argues that the drug test was not an adverse employment action in the first place, and that Mr. Ross has no evidence to support his allegation that the test was not random.  [Filing No. 42 at 12-13.]  FedEx asserts that Mr. Ross has not provided any evidence that FedEx treated similarly situated, non-disabled employees more favorably, and has not shown that FedEx's stated reason for terminating him – that he tested positive for opioids and was unable to provide a Safety Concern Letter – was a pretext for discrimination under the ADA.  [Filing No. 42 at 13-14.]

In his response, Mr. Ross argues that the premise of FedEx's Motion for Summary Judgment is that Mr. Ross's 2014 prescription was no longer valid and that he was disqualified to drive a CMV after his drug test.  [Filing No. 58 at 14.]  He argues that his 2014 prescription was valid as of April 1, 2019, that he disclosed his use of the medication to doctors, medical review officers, and FedEx on multiple occasions, and that Dr. Lopez accepted the prescription as valid. [Filing No. 58 at 14.]  Mr. Ross also contends that he was not disqualified to drive a CMV under

DOT regulations because Dr. Lopez eventually changed his test result to negative.  [Filing No. 58 at 14.]  He argues that "[t]he fact that [he] was not able to provide a safety letter is the fault of FedEx, not [Mr.] Ross."  [Filing No. 58 at 15.]  Mr. Ross contends that he has set forth a prima facie case of ADA discrimination because FedEx was aware of his disability, and he was meeting FedEx's expectations because he had been medically cleared to drive a CMV less than three months before his termination.  [Filing No. 58 at 19-21.]

In its reply, FedEx argues that Mr. Ross was not meeting its legitimate expectations because he could not legally operate a CMV with a positive drug test and he never produced a Safety Concern Letter.  [Filing No. 65 at 4-6.]  It also asserts that its drug testing process "is entirely randomized by a non-[FedEx] entity," and Mr. Ross "did not and cannot produce evidence to suggest otherwise."  [Filing No. 65 at 7.]  FedEx reiterates it arguments that Mr. Ross has not pointed to similarly situated, non-disabled employees who were treated more favorably, and that he has not provided any evidence indicating that FedEx's reasons for terminating him were pretextual.  [Filing No. 65 at 7-8.]

A claim for disparate treatment under the ADA "requires proof that: (1) the plaintiff was disabled; (2) the plaintiff was otherwise qualified to perform essential functions with or without reasonable accommodation; and (3) disability was the 'but for' cause of the adverse employment action." *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 996 (7th Cir. 2020) (citing *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019)).  A plaintiff asserting a discrimination claim under the ADA may proceed under the approach outlined by the Seventh Circuit Court of Appeals in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764-66 (7th Cir. 2016), where the question is "'whether the evidence [considered as a whole] would permit a reasonable factfinder to conclude'" that Mr. Ross was terminated due to his disability.  *Castetter*, 953 F.3d at 996 (quoting *Ortiz*, 834 F.3d at 765).

*Ortiz* dispensed with the old "direct- and indirect-framework" as it relates to the "proposition that evidence must be sorted into different piles, labeled 'direct' and 'indirect.'" 834 F.3d at 766. To show that discrimination was the "but for" cause of an adverse employment action, a plaintiff can point to direct evidence, such as an admission, or to circumstantial evidence, which includes: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Dickerson v. Bd. of Trustees of Comm. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011).

Additionally, the Seventh Circuit has not entirely done away with separate tests or methods to analyze discrimination cases, and it has stated that "the well-known and oft-used *McDonnell Douglas* framework for evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018); *see also McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019). Under the *McDonnell Douglas* framework, a plaintiff must show that "(1) he is disabled under the ADA; (2) he was meeting his employer's legitimate employment expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably." *Dickerson*, 657 F.3d at 601. "Once a plaintiff has established a *prima facie* case, the defendant must identify a legitimate non-discriminatory reason for its employment decision. If the defendant satisfies this requirement, the plaintiff must then prove by a preponderance of the evidence that the defendant's reasons are pretextual." *Id.* (citation omitted).

In order to show pretext, "[a] plaintiff must point to evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the termination." *Tibbs v. Admin. Office of the Ill. Courts*, 860 F.3d 502, 506 (7th Cir. 2017) (internal quotations and citations omitted). "Merely disagreeing with an employer's reasons does not meet this standard." *Id.*

At the outset, the Court finds that Mr. Ross cannot prove his claim under the *McDonnell Douglas* framework because he has not even attempted to set forth the last element of a prima facie case of disparate treatment – that FedEx treated similarly situated employees without a disability more favorably. Mr. Ross does not point to FedEx's treatment of any other employees, and does not address this element at all in his response brief. This leaves the Court to determine whether Mr. Ross has presented any evidence from which a reasonable factfinder could conclude that discrimination occurred.

In support of his claim, Mr. Ross focuses on his position that his 2014 prescription was still valid in 2019, that his drug test was not random, that he was not disqualified from driving a CMV, that Dr. Lopez changed his drug test result to negative, and that FedEx was at fault for not helping him to obtain a Safety Concern Letter from Dr. Lopez. But Mr. Ross's position is flawed for several reasons.

First and foremost, the proper lens through which to view Mr. Ross's disparate treatment claim is FedEx's stated reason for terminating his employment: that Mr. Ross initially tested positive for opioids and failed to provide a Safety Concern Letter. Even though Dr. Lopez changed

the drug test result to "negative,"[3] it is undisputed that Ms. Starkey informed Mr. Ross that in order to continue his employment as a CMV driver he had to provide a Safety Concern Letter, [*see* Filing No. 43-10 at 1], and that Mr. Ross failed to provide one, [*see* Filing No. 43-1 at 12 (Mr. Ross testifying: "Q: But you didn't have a safety concern letter for the prescription from 2014 because [Dr. Chee] retired and no one else would do it for you? A: Right")]. Ms. Starkey's letter to Mr. Ross unequivocally warned him that "[t]his letter will confirm the verbal notification and will detail your responsibilities in securing the necessary documentation to allow you to continue to work in a safety sensitive function." [Filing No. 43-10 at 1.] Even though Mr. Ross believed that he was still permitted to take medication prescribed in 2014,[4] he still needed to provide a letter from his prescribing physician and he was unable to do so. His failure to provide the Safety Concern Letter violated FedEx policy and DOT policy. And any notion that it was FedEx's fault that Mr. Ross could not secure a Safety Concern Letter because it would not let him see Dr. Lopez is irrelevant. Ms. Starkey's April 12, 2019 letter specifically stated that the Safety Concern Letter had to be from the "prescribing physician in writing on his/her letterhead," among other things. Dr. Lopez was not the prescribing physician.

---

[3] The use of the term "negative" implies that the test did not actually uncover the use of opioids, but the parties do not dispute that the test accurately reflected that Mr. Ross had used opioids. For purposes of Mr. Ross, though, the change to "negative" meant that he could drive a CMV if he was able to provide a Safety Concern Letter to FedEx.

[4] The Court has concerns regarding Mr. Ross's veracity as to never re-filling his 2014 prescription and simply taking the twenty pills as initially prescribed over a five-year period. As the Court has noted, it is apparent from the pictures provided by Mr. Ross, and from documentation from Mr. Ross's pharmacy, that Mr. Ross re-filled the 2014 prescription at least once. Nevertheless, while the Court takes the discrepancy between Mr. Ross's sworn Affidavit and the photographs and pharmacy records seriously, whether Mr. Ross re-filled the prescription is not ultimately significant to the Court's analysis as it does not change the fact that Mr. Ross never provided a Safety Concern Letter.

Mr. Ross also has not presented any evidence that his drug test was not random.  It is undisputed that DSI was the third-party administrator of FedEx's drug tests, and that DSI provided FedEx with a list of employees who would be randomly tested – and not the other way around. [*See* Filing No. 43-6 at 2.]  Mr. Ross's own belief that his drug test was not random cannot support a disparate treatment claim.  *See Winsley v. Cook Cnty.*, 563 F.3d 598, 605 (7th Cir. 2009) (plaintiff's "bare assertions" that treatment was linked to protected status were insufficient to establish a link between the protected status and the treatment).

In short, Mr. Ross has not presented evidence from which a reasonable jury could conclude that he was terminated due to his disability.  Rather, he was terminated for violating FedEx policy and DOT regulations by failing to provide a Safety Concern Letter addressing his use of a five-year-old prescription for opioids.  The Court **GRANTS** FedEx's Motion for Summary Judgment on Mr. Ross's ADA discrimination claim based on disparate treatment.

### 2.    *Failure to Accommodate*

In support of its Motion for Summary Judgment, FedEx argues that Mr. Ross was not a qualified individual, and that he has not presented evidence that FedEx failed to provide a reasonable accommodation.  [Filing No. 42 at 14-15.]  FedEx notes that Mr. Ross's requested accommodation – the appropriate use of a prescribed medicine – is not reasonable because the medicine was prescribed in 2014 and "should have been finished in five days." [Filing No. 42 at 14.]  FedEx contends that Mr. Ross has admitted that he did not request any reasonable accommodation for any alleged disabilities and that as for difficulties with his teeth, he "has not provided any medical evidence that an accommodation was necessary and testified that no subsequent employer is accommodating this particular issue." [Filing No. 42 at 14.]

In his response brief, Mr. Ross seems to conflate his disparate treatment claim with his failure to accommodate claim, proceeding through the elements of a disparate treatment claim but then discussing the "final element" of his failure to accommodate claim. [Filing No. 58 at 18-21.] He argues that FedEx failed to engage in the collaborative process, by "requiring or even permitting [Mr.] Ross to visit a medical review officer to evaluate the use of the prescribed pain medication," or by "approv[ing his] FMLA leave and requir[ing him] to take an FMLA day every time he needed to take a prescribed pain pill." [Filing No. 58 at 21.]

FedEx argues in its reply that Mr. Ross's "undisclosed use of the prescription violated DOT regulations and company policy and cannot be considered reasonable." [Filing No. 65 at 8.]

"A claim for failure to accommodate under the ADA…requires proof [that] (1) plaintiff was a qualified individual with a disability; (2) defendant was aware of his disability; and (3) defendant failed to accommodate his disability reasonably." *Scheidler*, 914 F.3d at 541 (emphasis omitted).  Mr. Ross's failure to accommodate claim fails for the simple reason that he testified at his deposition that he never requested an accommodation for any of his purported disabilities. Specifically, Mr. Ross testified as follows:

> Q:  All right.  This – okay.  Let's unpack that a bit because I'm not sure how they all relate.  What is your disability?
>
> A:  My Bell's palsy's something I'm going to have for the rest of my life, and my hearing.
>
> Q:  Okay.  And we already discussed that there is no accommodation for your Bell's palsy; correct?
>
> A:  I don't know what you mean by that.
>
> Q:  Well, I mean the employer can't do anything to assist you with your job because you have that?
>
> A:  I guess not.

23

Q:  Right?  I mean, you didn't go to FedEx and say, Hey, I need a special chair or I need anything; correct?

A:  No, I did not.  No.

Q:  Okay.  So that's not really a disability in terms of for an employer.  You can do your job.  You don't need anything special to do your job.

A:  I'm sorry.  Yes.

Q:  Okay.  Let's talk about your teeth.  Is there something that you needed to work in order to assist with your teeth?

A:  If I'm in pain, I just need water to kind of keep swashing it.

Q:  Okay.

A:  That's how I got through my day most of the time.

Q:  Did FedEx ever deny your ability to have water?

A:  Have they?

Q:  Yes.

A:  No.

[Filing No. 43-1 at 10-11.]

Mr. Ross's testimony is fatal to his failure to accommodate claim.  FedEx cannot have failed to accommodate his disability when Mr. Ross himself testified that he did not require any accommodation and did not request any accommodation.  Further, even if he required an accommodation to take prescription pain medication as needed, Mr. Ross has not presented any evidence that FedEx failed to reasonably accommodate him.  FedEx gave Mr. Ross the opportunity to provide a Safety Concern Letter addressing his prescription pain medication use, and Mr. Ross did not do so.  As discussed above, FedEx was under no obligation to help Mr. Ross obtain the Safety Concern Letter and, in any event, the letter had to come from the prescribing physician, not from Dr. Lopez.

Mr. Ross has not presented sufficient evidence from which a reasonable jury could conclude that FedEx failed to reasonably accommodate Mr. Ross's disability, and the Court **GRANTS** FedEx's Motion for Summary Judgment as to Mr. Ross's failure to accommodate claim.

### B.    ADA Retaliation Claim

FedEx argues in support of its Motion for Summary Judgment that Mr. Ross has not pointed to any evidence that FedEx retaliated against him, and that any claim that taking a prescription from 2014 was protected activity is unfounded. [Filing No. 42 at 15.] FedEx also notes that Mr. Ross had not asked for any reasonable accommodations for a disability, and that any request to use the prescription would have been unreasonable and was against DOT regulations. [Filing No. 42 at 15.] FedEx again notes that Mr. Ross did not provide a Safety Concern Letter, and asserts that Mr. Ross has not shown that FedEx's reason for terminating him was dishonest. [Filing No. 42 at 16.]

In his response, Mr. Ross argues that he engaged in protected activity by informing FedEx that he needed to take prescription pain medication from time to time, and that his termination was "a textbook case of retaliation." [Filing No. 58 at 23.]

FedEx argues in its reply that Mr. Ross did not disclose his prescription pain medication use on his DOT Forms and did not request an accommodation, so he has not shown that he engaged in a protected activity. [Filing No. 65 at 9.] FedEx reiterates its arguments regarding a lack of evidence of pretext. [Filing No. 65 at 9.]

The ADA provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." 42 U.S.C. § 12203(b).

A claim of retaliation under the ADA requires proof that "[the plaintiff] engaged in protected activity, that [he] suffered an adverse action, and that there is a causal connection between the two." *Rowlands v. United Parcel Serv. – Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018). The retaliation must be "a but-for cause of the adverse employment action." *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 963 (7th Cir. 2010).

The threshold issue in this case is whether Mr. Ross engaged in a protected activity under the ADA. He claims that he did, because he needed to take the prescription pain medication periodically. But the problem with his argument is that he did not disclose his use of the pain medication on his DOT Forms, and he testified that he never requested an accommodation under the ADA related to taking the pain medication. In any event, even if he had engaged in protected activity, he has not presented any evidence of a causal link between the protected activity and his termination. Mr. Ross would need to "demonstrate a triable issue as to whether discrimination motivated [his termination]." *Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). Again, under *Ortiz*, the Court considers the evidence as a whole, without categorizing it as "direct" or "indirect" evidence. *Ortiz*, 834 F.3d at 765. That evidence shows that Mr. Ross was terminated for failing to provide a Safety Concern Letter, which violated FedEx policy and DOT regulations. It does not show that he was fired for requesting to take prescription pain medication from time to time.

In short, there is no evidence from which a reasonable jury could conclude that FedEx retaliated against Mr. Ross for any activities he undertook that were protected by the ADA. The Court **GRANTS** FedEx's Motion for Summary Judgment as to Mr. Ross's ADA retaliation claim.

### C.     ADA Confidentiality Violation Claim

As to Mr. Ross's confidentiality violation claim under the ADA – in which he alleges that FedEx disseminated his confidential medical and disability-related information to employees of

26

FedEx and potential employers "who had no need to be aware of [his] condition," [Filing No. 1 at 10] – FedEx argues that drug tests are not considered medical examination, the results of which are protected under the ADA.  [Filing No. 42 at 16-17.]  It also asserts that Mr. Ross has not presented evidence of "any sort of tangible injury as a result of the alleged disclosure."  [Filing No. 42 at 17 (quotation omitted).]

Mr. Ross does not address his ADA confidentiality violation claim in his response brief. [*See* Filing No. 58.]  FedEx notes this in its reply, and argues that Mr. Ross has abandoned that claim.  [Filing No. 65 at 10.]

Mr. Ross did not respond to FedEx's arguments regarding his ADA confidentiality violation claim, [*see* Filing No. 58], and has therefore waived any opposition to those arguments. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument…results in waiver"); *Laborers' Inter. Union of North America v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (holding that arguments not presented in response to motion for summary judgment are waived); *De v. City of Chicago*, 912 F. Supp. 2d 709, 734 (N.D. Ill. 2012) ("Failure to set forth any evidence or to develop any arguments in opposition to the moving party's summary judgment motion results in waiver of the nonmoving party's arguments and an abandonment of his claims").  Consequently, the Court **GRANTS** FedEx's Motion for Summary Judgment on Mr. Ross's confidentiality violation claim under the ADA.

### D.   FMLA Claims

Although Mr. Ross sets forth only one Count in his Complaint under the FMLA – Count VI, for "Violations of the [FMLA]," [Filing No. 1 at 11] – it appears that he asserts claims for interference with his rights under the FMLA, and discrimination/retaliation for exercising those rights.  The Court addresses each claim in turn.

1.    *FMLA Interference*

In support of its Motion for Summary Judgment, FedEx argues that Mr. Ross received all of the FMLA leave he requested, with the exception of his last request right before his termination. [Filing No. 42 at 19.]  FedEx notes that Mr. Ross's last FMLA leave request was delayed because he had failed to provide certain documentation and that his "vague allegations of denials of other leave requests are not supported by any evidence."  [Filing No. 42 at 19-20.]

In his response, Mr. Ross argues that Dr. Sweeny submitted the paperwork that FedEx requested on August 13, 2018, that FedEx did not request any additional documentation, and that FedEx never approved the request.  [Filing No. 58 at 17.]

In reply, FedEx contends that Mr. Ross never mentioned needing surgery in any of his paperwork related to his August 2018 FMLA leave request.  [Filing No. 65 at 10-11.]  It also asserts that it requested additional information from Mr. Ross in connection with his last FMLA leave request, and did not receive that additional information before Mr. Ross's termination. [Filing No. 65 at 11.]  FedEx notes that Mr. Ross now claims he needed FMLA leave for dental and hearing issues, but that the paperwork he had submitted from 2014 to 2018 only mentioned migraines, sleep apnea, and Bell's palsy.  [Filing No. 65 at 11-12.]  FedEx also argues that even if there was a delay in approving his August 2018 FMLA leave request, Mr. Ross testified that his supervisor told him to take whatever days off that he needed and that those days would be back-approved once his leave request was granted.  [Filing No. 65 at 12.]

The FMLA entitles eligible employees suffering from a qualifying illness to up to twelve weeks of unpaid leave in a twelve-month period.  29 U.S.C. § 2612(a)(1)(A)-(D).  Under the FMLA, it is "unlawful for [an] employer to interfere with, restrain, or deny" an employee's "exercise of or … attempt to exercise [] any right provided under" the Act.  29 U.S.C. § 2615(a)(1).

To prove an FMLA interference claim, Mr. Ross must establish that: "(1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to take leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied [or interfered with]… FMLA benefits to which he was entitled." *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 816 (7th Cir. 2015) (quoting *Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 635-36 (7th Cir. 2009) (internal quotation marks omitted)).

Here, there is no dispute that Mr. Ross was an eligible employee and that FedEx was covered by the FMLA.  At issue is whether FedEx interfered with his rights under the FMLA.  The undisputed facts show that Dr. Sweeny submitted Mr. Ross's FMLA paperwork to FedEx to renew his existing leave for treatment of Bell's palsy, migraines, and sleep apnea on August 13, 2018. FedEx acknowledges that there was a delay in processing Mr. Ross's request but by all accounts, including Mr. Ross's, Mr. Ross was still able to take FMLA leave after he submitted his August 13, 2018 request but before it was formally granted.  [*See* Filing No. 58-2 at 116-18.]  When FedEx eventually informed Mr. Ross that he needed to submit additional documentation for his August 13, 2018 FMLA leave request, Dr. Sweeny submitted the missing documentation on March 18, 2019.  FedEx requested additional missing information from Mr. Ross, and he did not provide it before his termination.  Consequently, Mr. Ross's last FMLA leave request was never formally granted.  Further, the documentation Mr. Ross submitted in connection with the August 13, 2018 request and the March 18, 2019 supplementation did not mention dental or hearing issues, or a need for surgery – the bases asserted by Mr. Ross for Mr. his FMLA interference claim.

Additionally, to the extent that Mr. Ross is claiming that he made a separate request for FMLA leave on March 30, 2019 after taking the pain medication, FedEx was under no obligation to approve or deny that request on the spot, without any paperwork to support Mr. Ross's request.

*See* 29 U.S.C. § 2613(a) ("An employer may require that a request for leave under subparagraph (C) or (D) of paragraph (1) or paragraph (3) of section 2612(a) of this title be supported by a certification issued by the health care provider of the eligible employee…as appropriate. The employee shall provide, in a timely manner, a copy of such certification to the employer"); *Hansen v. Fincantieri Marine Group, LLC*, 763 F.3d 832, 837 (7th Cir. 2014) ("When an employee initially requests FMLA leave, the employer may take the employee at his word and grant the request, or may request certification by the employee's healthcare provider") (quotation and citation omitted). As the Court has already noted, the only FMLA leave requests Mr. Ross submitted that were properly supported by documentation were for treatment of Bell's palsy, migraines, and sleep apnea – not for chronic pain from dental issues.

In sum, Mr. Ross has not produced evidence from which a reasonable jury could conclude that FedEx denied any completed requests for FMLA leave related to any of his health issues, or related to a need for surgery.  The Court **GRANTS** FedEx's Motion for Summary Judgment on Mr. Ross's FMLA interference claim.

## 2.    *FMLA Discrimination/Retaliation*

FedEx argues in support of its Motion for Summary Judgment that Mr. Ross has not shown that his request for FMLA leave caused his termination.  [Filing No. 42 at 20.]

In his response, Mr. Ross notes that he engaged in protected activity when he requested FMLA leave on August 13, 2018, that he was denied leave on April 1, 2019 and then was subjected to a drug test, and that he was terminated shortly thereafter.  [Filing No. 58 at 23.]  Mr. Ross argues that the temporal proximity between his re-submission of his FMLA request just two weeks before his drug test and his eventual termination creates a genuine issue of material fact regarding FedEx's motives.  [Filing No. 58 at 24.]

In reply, FedEx reiterates its arguments that it never denied Mr. Ross's FMLA leave requests.  [Filing No. 65 at 13.]

The FMLA prohibits employers from discharging or otherwise discriminating against employees for exercising or attempting to exercise FMLA rights.  29 U.S.C. § 2615(a)(2),(b).  Unlike an interference claim, a claim of retaliation requires a showing of discriminatory or retaliatory intent.  *See Kauffman v. Federal Express Corp.*, 426 F.3d 880, 884-85 (7th Cir. 2005); *Goezler v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 995 (7th Cir. 2010).  In asserting a retaliation claim under the FMLA, a plaintiff may proceed under the direct or indirect methods of proof. *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 823-24 (7th Cir. 2011).  A plaintiff can state a claim under the direct method by alleging that: (1) he exercised or attempted to exercise rights protected by the FMLA; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and rights protected by the FMLA.  *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 670 (7th Cir 2011)  Under the indirect method, a plaintiff can state a claim for FMLA retaliation by alleging that he was treated less favorably than other similarly situated employees who did not take FMLA leave, even though he was performing his job in a satisfactory manner.  *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006).

Mr. Ross's FMLA discrimination/retaliation claim fails because has not presented any evidence that he was terminated for requesting FMLA leave.  Rather, he was terminated for failing to provide a Safety Concern Letter after testing positive for opioids.  The temporal proximity between his FMLA leave request and his eventual termination is not enough, without more, to link Mr. Ross's termination to his leave request.  *Silk v. Board of Trustees, Moraine Valley Comm. Coll., Dist. No. 524*, 795 F.3d 698, 710 (7th Cir. 2015) ("[S]uspicious timing alone will rarely be sufficient…to create a triable issue") (quotation and citation omitted); *Burks v. Wisconsin Dept. of*

*Transp.*, 464 F.3d 744, 758-59 (7th Cir. 2006) ("[S]uspicious timing alone…does not support a reasonable inference of retaliation [because the] mere fact that one event preceded another does nothing to prove that the first event caused the second").  Further, the evidence shows that FedEx had approved Mr. Ross's FMLA leave requests from 2014 to 2018, and that it allowed him to take time off before his last request was formally approved and agreed to back-approve that time once his FMLA leave request was formally granted.  There is no evidence to support the notion that FedEx suddenly stopped approving requests and, moreover, terminated him for making the requests.

Absent any evidence from which a reasonable jury could conclude that Mr. Ross's termination was in retaliation for requesting FMLA leave, or that FedEx discriminated against Mr. Ross for requesting FMLA leave by terminating him, the Court **GRANTS** FedEx's Motion for Summary Judgment on Mr. Ross's FMLA discrimination/retaliation claim

### E.   Intentional Infliction of Emotional Distress

In support of its Motion for Summary Judgment, FedEx argues that Mr. Ross's termination did not constitute the type of outrageous conduct required to support an intentional infliction of emotional distress claim under Indiana law.  [Filing No. 42 at 18-19.]

Mr. Ross responds that FedEx's conduct caused him to suffer additional hearing loss and severe emotional damage because he had to "delay a much needed medical procedure to relieve pain." [Filing No. 58 at 24-25.]  He also argues that pain in his tooth and jaw continued until he was able to receive medical treatment in May 2019, and that he has yet to have a procedure on his ear to correct progressive hearing loss because FedEx did not approve his last FMLA leave request. [Filing No. 58 at 25.]

In its reply, FedEx notes that Mr. Ross never mentioned needing surgery in his FMLA leave requests.  [Filing No. 65 at 10.]

Because the Court has granted FedEx's Motion for Summary Judgment on all of Mr. Ross's federal claims, it must determine whether it will exercise jurisdiction over his intentional infliction of emotional distress claim.   A district court ultimately has discretion whether to exercise supplemental jurisdiction over a plaintiff's state law claims.  *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim…if…the district court has dismissed all claims over which it has original jurisdiction…").  When deciding whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quotations and citations omitted).

The Court finds that the balance of factors weighs in favor of exercising supplemental jurisdiction over the remaining state law claim.  First, as to judicial economy, the parties have already engaged in discovery on the intentional infliction of emotional distress claim.  Second, as far as convenience, witnesses and evidence related to the intentional infliction of emotional distress claim are likely located in Indianapolis, Indiana where this Court and the appropriate state court to adjudicate that claim are located, making this factor a wash.  And third and fourth, the Court is perfectly capable of applying Indiana law, and does not find that either party would be prejudiced by it doing so, making those factors weigh in favor of this Court exercising supplemental jurisdiction over the state law intentional infliction of emotional distress claim.

In order to prove a claim for intentional infliction of emotional distress, Mr. Ross must establish that FedEx engaged in extreme and outrageous conduct, which intentionally or recklessly

caused severe emotional distress to another. *Westminster Presbyterian Church of Muncie v. Yonghong Cheng*, 992 N.E.2d 859, 870 (Ind. Ct. App. 2013) (citing *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991)).  Indiana courts use a rigorous standard to establish extreme or outrageous conduct. *Westminster*, 992 N.E.2d at 870.  Outrageous conduct must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quotation and citation omitted).  "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Bradley v. Hall*, 720 N.E.2d 747, 752-53 (Ind. Ct. App. 1999).

Mr. Ross simply has not presented evidence to support the notion that FedEx's conduct in considering his FMLA leave requests rose to the level of extreme or outrageous conduct.  FedEx granted all of Mr. Ross's leave requests except for his last one.  Mr. Ross's doctor submitted missing documentation just a few weeks before Mr. Ross's termination, and Mr. Ross never submitted follow-up information that Ms. Rhoades requested after that.  Mr. Ross's claim that FedEx's failure to approve the request constituted extreme and outrageous conduct because it led to additional hearing loss and prolonged dental issues due to not being able to undergo surgery is undercut by the fact that he did not mention needing surgery – or even needing time off for dental or hearing issues – in his leave request.  The record evidence could not lead a reasonable jury to conclude that FedEx engaged in the type of extreme and outrageous conduct needed to support Mr. Ross's intentional infliction of emotional distress claim, the claim fails as a matter of law, and the Court **GRANTS** FedEx's Motion for Summary Judgment on that claim.

## IV.
### CONCLUSION

Mr. Ross may have believed that he was permitted to take pain medication prescribed in 2014 over a five-year period as needed, but the fact remains that he did not provide FedEx with a Safety Concern Letter from his prescribing physician after testing positive for the use of opioids. His failure to produce any evidence that FedEx terminated him based on his disability, that FedEx terminated him due to his exercise of rights under the ADA or the FMLA, that FedEx interfered with his rights under the FMLA, or that FedEx engaged in extreme or outrageous conduct, is fatal to his claims. For the foregoing reasons, the Court **GRANTS** FedEx's Motion for Summary Judgment, [43]. Final judgment shall enter accordingly.

Date: 9/21/2021

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

35